BARRY, Judge.
Northhampton Investments Corporation appeals a judgment which ranks Dryades Savings and Loan Association’s mortgage before a mortgage on property which was seized and sold after non-payment of Dryades’ note.
BACKGROUND
On April 5, 1982 Mr. and Mrs. Jeffrey Miller purchased a house on Octavia Street. They signed a $250,000 promissory note payable to Dryades Savings and Loan Association which was secured by a mortgage on the property. They also signed a $50,-000 note (the Herman note) payable to the order of Bearer that was also secured by a mortgage on the same property. The mortgage securing the Herman note was recorded April 6, 1982 and the mortgage securing the Dryades note was recorded April 13, 1982.
The Millers failed to pay the Herman note timely. Its due date, October 5, 1982, was extended to December 21, 1982, to January 5, 1983, and then to January 13, 1983. On January 13, 1983 Herman assigned the note and mortgage to North-hampton, but the mortgage was not recorded until May 1,1985. Whether there was a payment on the Herman note after January 13, 1983 is a contested issue.
In 1988 Dryades seized the Octavia property and it was sold because of non-payment of its loan. Dryades filed a rule to show cause to rank the two notes and mortgages in order to disburse the money. After a hearing the commissioner recommended that the Dryades mortgage primes Northhampton’s mortgage. The trial court overruled Northhampton’s exceptions to the commissioner’s report and concluded that Dryades’ mortgage had priority.
Northhampton now argues that the trial court erroneously concluded that prescription on the Herman note had not been interrupted and that the note had prescribed.
THE RECORD
Jeffrey Miller testified that he and his wife signed two notes when they purchase their $340,000 home. The $250,000 note was for a loan from Dryades and the $50,-000 Herman note was intended as a second mortgage. The Herman note was due in October, 1982, but in November, 1982 he paid $5,000 for a 30 day forbearance. Miller then arranged with Bill Nathan (a principal holding the controlling interest in Northhampton) with whom he had business dealings, to purchase the Herman mortgage note. According to Miller, Nathan wired the money to a trust account in Northhampton’s law firm’s name, the Her-mans were paid and assigned the note to Northhampton on January 13, 1983.
When he was asked whether he subsequently made a payment on the note, Miller said: “Not specifically, no.” However, he stated that he made payments to North-hampton from 1983 to 1987. Miller identified a $1,237.56 check dated February 13, 1986, but did not remember what “that check was for.” He also identified two Whitney Bank deposit tickets for North-hampton Investments: one dated October 1,1984 for $2,591.72 (marked “From Jeff”); one dated December 12, 1984 for $1,695.78 (marked “Jeff’s ck. Redeposited”).
Between 1982 and 1986 Miller sent various sums of money to Northhampton, but he did not know what account was credited. No documentation indicated the specific ac *843 count to which the amounts were credited. Miller conceded that the payments could have been reimbursement for expenses. He testified that he had no other debt to Northhampton. On cross-examination Miller admitted that in a prior sworn affidavit he declared that he had made no payment on the $50,000 note.
Miller claimed he talked to Nathan and Ed Arbour, an officer of Northhampton, between 1983 and 1985 about the debt, but he did not know the dates or remember what was said.
Mark Herman testified that his $50,000 note secured on the property he sold to the Millers, was not timely paid by October 5, 1982 because Miller’s check was returned NSF. Herman accepted $5,000 to extend the due date by 30 days, and in the extension the Millers acknowledged the mortgage and note were “valid obligations due and owing by us....” When the note was not paid, Herman’s brother Avram, an attorney, wrote a demand letter on January 4, 1983. A January 12, 1983 letter stated that Avram Herman would file for exec-utory process at noon, January 13, 1983. On January 13, 1983 the Hermans assigned the note to Northhampton. Mark Herman did not know the source of the funds he received and Avram Herman corroborated his testimony.
Edward Arbour, vice-president of North-hampton in 1984-1985, was asked whether Miller acknowledged the debt to him or said that he and his wife still owed the obligation, and he responded: “Oh, yes.” Arbour said Miller acknowledged “many times that he owed the debt and that he intended to repay it.” However, Arbour could only narrow the conversations during 1984, 1985 and 1986. Arbour recalled no specific statement or conversation. He testified that he did not know if Miller had other debts with Northhampton. However, counsel referred to Arbour’s deposition which states he knew that Miller had debts with Northhampton other than the Herman note but he did not “know exactly.”
The record contained the following pertinent documentation:
Dryades’ $250,000 note executed April 5, 1982 (in the vault, copy in exhibits) and the mortgage which secured the note which was filed April 13, 1982; a copy of the $50,000 promissory bearer note (the Herman note) and the mortgage securing the note recorded April 6, 1982;
copies of Avram Herman’s November 8, 1982 letter to the Millers informing them of possible foreclosure proceedings and his January 12, 1983 letter stating that executory process would be filed by noon on January 13, 1983 if the note had not been paid by that date;
Mr. and Mrs. Miller’s November 21, 1982 letter to.Mark Herman requesting forbearance for 30 days (for $5,000) from the date of the letter and acknowledging the debt;
a copy of the assignment of the $50,000 note (the Herman note) and mortgage by Mr. and Mrs. Herman to Northhampton on January 13, 1983 (recorded May 1, 1985);
Dryades’ interrogatories and North-hampton’s answers, specifically North-hampton’s answer to number 4 that it did not maintain a ledger for payments in regard to the Miller note (along with documentation);
copies of Whitney Bank deposit tickets dated October 1, 1984 for $2,591.72 (“From Jeff”), dated November 29, 1984 for $1,760.10 (“Jeff’s expenses”); dated December 12, 1984 for $1,695.78 (“Jeff’s ck. Redeposited”);
a copy of Miller’s $1,237.56 check to Northhampton dated February 13, 1986; page 30 of Ed Arbour’s deposition testimony which states he knew Miller had debts with Northhampton other than the Herman note;
a June 20, 1988 sworn affidavit by Jeffrey Miller stating: “That no payments have ever been made on said note, that he has never done any act, made any statement or done anything else to acknowledge the debt due on said note nor did he ever have any intent at anytime to interrupt any prescription running against said note.”
*844 The commissioner concluded that the Dryades mortgage primes the Northhamp-ton mortgage because: (1) there is no adequate evidence to prove that the alleged payments) by Miller to Northhampton were credited to the bearer note and is prescribed; (2) the only testimony relative to verbal acknowledgment of the debt by Mr. Miller (not his wife) came from two people associated with Northhampton, which is self-serving and no documentary proof was offered; (3) the Dryades’ note and mortgage (executed April 5, 1982 but not recorded until April 13, 1982) primes the Northhampton note because it is a vendor’s lien; and (4) Northhampton failed to produce the original note in order to establish that it was the holder of the bearer note.
In reasons for judgment the trial court found that the commissioner erroneously concluded that the Dryades mortgage was a timely filed vendor’s lien. However, the court held that the commissioner correctly determined that the Northhampton (Herman) note had prescribed. The note was due on January 13, 1983, the day North-hampton purchased the note. After that date there is no proof of a payment by Miller. According to the trial court, the five year prescriptive period commenced to run on January 13, 1983.
Because Miller owed other debts to Northhampton, the court stated there was no evidence that the checks and deposits in odd amounts were in payment of the Herman note. Only Northhampton’s employee, Ed Arbour, stated that Miller discussed his debts to Northhampton at some unspecified time.
The court held that the two checks and Arbour’s self-serving testimony did not constitute an acknowledgment and the note prescribed on January 13, 1988.
LAW AND ANALYSIS
Actions on promissory notes are subject to a liberative prescription of five years, commencing to run from the day payment is exigible. La.C.C. art. 3498. Prescription is interrupted when one acknowledges the right of the party against whom he commenced ■ to prescribe. La.C.C. art. 3464.
To interrupt prescription, acknowledgment must be of a specific debt and it must be stated in clear and certain terms. It must have a clear declaration of intent to interrupt prescription. Wooden v. Hartford Insurance Company, 335 So.2d 742 (La.App. 2d Cir.1976). A verbal acknowledgment must be unequivocal, clear and convincing. Cohen v. Toy, 150 So.2d 605 (La.App. 4th Cir.1963).
A reviewing court may not set aside a trial court finding of fact in the absence of manifest error. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even if the appellate court believes its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973). When findings are based on determinations regarding the credibility of witnesses, the clearly wrong standard demands great deference to the trier of fact’s findings. Unless documentation clearly contradicts a witness’ story or the story is so internally inconsistent on its face, a credibility call can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We find no manifest error in the trial court judgment. Northhampton did not produce the original bearer note. It produced no ledgers, account sheets, deposit tickets, or other documentation to show that Miller made payments on the note subsequent to January 13, 1983. Miller’s nebulous testimony that he made several payments on some accounts did not prove that he made a payment on the note. Miller conceded the payments could have been reimbursements for expenses. His testimony that he talked to Nathan (who did not testify) and “[pjrobably” to Arbour about payment of the note did not prove acknowledgment.
The Dryades’ mortgage was properly ranked before Northhampton’s mortgage.
*845 The judgment is affirmed.
AFFIRMED